### Huston v. Commonwealth.

(Decided Oct. 7, 1938.)

(As Modified on Denial of Rehearing Oct. 21, 1938.)

ROBERT J. WATSON for appellant.

HUBERT MEREDITH, Attorney General, and WILLIAM F. NEILL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appellant by an indictment returned in the Bell circuit court was charged with having murdered Lucy Williams, his cousin. The homicide occurred about 7 p. m. on January 10, 1937. Besides the charge of murder the indictment carried charges of three former convictions, one for murder and two others for malicious cutting and wounding.

Appellant has had two trials on this same indictment. On his first trial, on a plea of guilty, the death penalty was inflicted. This court reversed the judgment on the sole ground that the jury had received evidence or information not in conformity with Section 239 of the Criminal Code of Practice, and a new trial was directed. The former opinion may be found in 270 Ky. 125, 109 S. W. (2d) 45.

Upon a return a new trial under a plea of not guilty resulted in conviction, and the infliction of the death penalty, and from a judgment carrying into effect the verdict, appellant prosecutes this appeal, urging for reversal only two grounds: (a) The court failed to give the jury the instruction that if there be in their minds a reasonable doubt of the degree of the offense committed, they should inflict the lower penalty. (b) The court refused to admit proof of insanity, on the

ground that self-defense and insanity are inconsistent defenses.

The facts (which are not fully stated in the former opinion) appear to be that early in the evening of January 10, 1937, the coroner of Bell county viewed the body of Lucy Williams, lying in a room back of the Piedmont Hotel in Middlesboro. She was dressed in her usual clothing. Her body was lying on a bed on her back, one foot on the bed, the other on the floor, with one arm across her chest. She had two wounds, one near the center, and the other a little to the left, in the small of her back. Two below the breast, about an inch from the arm pit on the left side, and eleven around the region of the heart. The coroner was of the opinion that the body had not been moved after the infliction of the wounds. He found no blood at any point in the room, other than on the bed. There was no evidence of a struggle, and no scissors or knife were found in the room.

A sister of deceased testified that appellant and witness lived at the home of Angy and Frank Sharp; that she and Angy and Frank were at home on the evening of the homicide when appellant came in and said, "Lucy is dead, you had better go and see about it. I ain't got nothing to do with it." Some one of the three expressed doubt of his statement that Lucy was dead, and appellant then said, "Yes she is dead because I stabbed her seven times in the breast and stood over her until the last breath went out of her. I went down to her room, and she and Bill Liggon were in the bed, and Bill asked me what time it was and I told him was about ten minutes to six." He then recited that Bill left and he and Lucy got into an argument, and she got mad and struck at him with a pair of scissors, and he killed her. Appellant was wearing a gray felt hat which had blood on it, and started to burn it up; but was prevented from doing so. Appellant remarked that if he had as much as $10 he would leave, but finally decided to surrender. He and Frank Sharp left their home, but in a short while returned, and accused said: "Nobody has found her body yet, and nobody knows I did it, except us three in this room; you all are not going to tell it are you?" and Frank answered "No" and he said to witness, "If you will not tell it I will give you $25.00." This offer was refused and appellant left.

Angy and Frank Sharp testify substantially as did Sally Smith. There is no material difference in the testimony of the policemen who went to the scene of the homicide, and made examination of the room where the body of deceased was found, and that of the coroner.

Huston testified that he went to Lucy's room about 5:30 on January 10; when he arrived Lucy and Bill Liggon were in bed. "Bill got up and put his clothes on, and Lucy got up too. Bill asked me the time and I told him ten minutes to six and he left." In the meantime Pauline Taylor, and Frank Bank had come in. They left about 7 o'clock. After they left appellant began to chide deceased about her conduct. Lucy had been ill, and appellant had been paying her medical bills and taking care of her for a month or more. Appellant told deceased that it was wrong to have Liggon in the room with her, suggesting that if she were arrested he would have to pay the fine. She became angered at this saying, "It is none of your business." She then reached in a drawer and got a pair of scissors and "tried to cut me, striking me with them and I could not get away for her. I seen I couldn't keep her off, and I had my little knife in my pocket and I grabbed it." The knife was an ordinary fruit or peeling knife. He then says he stabbed her, and she still tried to fight with the scissors, "but I kept away, she was cutting so fast. I just pulled her over on the bed and left her there. My hat fell off on the bed, and I picked it up; pulled the door to and went to my sister's." He says he told them about killing her "but didn't make all the statement they had made." He and Frank Sharp went back to the room, peeped through the window and saw she was dead, but decided not to go in. He denies the statements as to the offer of $25 to Sally Smith to keep silent about the matter. He said he killed her because he thought she would kill him with the scissors. He says he picked up the scissors and put them back in the dresser drawer.

The foregoing is the substance of the material testimony. Two witnesses for defendant testified that Lucy's general reputation was bad. Mrs. Rohrer, after stating that accused had worked "off and on" for her about three years, was asked, "During the time he worked for you * * * what was his conduct, or how did he conduct himself?" The court ruled that the witness

should not answer, and it is upon this ruling that appellant contends that the court held, in the absence of a plea of insanity, no proof looking to that plea could be introduced. We do not so construe the court's ruling, since the court said: "If counsel for defendant desires to prove that he is insane, I will let him do that." The court may have been in error in ruling on the question, but we can not determine whether so or not, since there is no avowal as to what the response of witness would have been. However, since the judgment must be reversed on another ground we shall discuss this point no further.

The first ground upon which appellant relies for reversal is meritorious, and the attorney general frankly so admits.

The court, as we observe the record, correctly gave an instruction on murder, voluntary manslaughter, self-defense, and the usual "reasonable doubt" of guilt instruction, as well as instructions defining technical words and terms.

Following the given voluntary manslaughter instruction, which authorized a penalty of from two to twenty-one years imprisonment, the court instructed the jury that if they should find accused guilty of voluntary manslaughter, and further found beyond a reasonable doubt that he had been twice previously convicted on felony charges, the period of confinement should be for his natural life.

By inadvertence, perhaps, the court failed to give an instruction, as is authorized by sec. 239 of the Criminal Code of Practice, as follows: "If there be a reasonable doubt of the degree of the offense which the defendant has committed, he shall only be convicted of the lower degree."

From the proof as adduced by the commonwealth, the jury concluded that the homicide was deliberate, wilful murder. On the other hand, the testimony of appellant, in endeavoring to show self-defense on his part, tends to show that the difficulty arose suddenly, thus opening a way for the jury to conclude, if it so saw fit, that the crime was voluntary manslaughter; a killing in sudden passion. The habitual criminal instruction was correctly given, since there was not only indictment, but ample proof and admission of two previous

felony convictions. With the habitual instruction given, had the jury concluded guilt of voluntary manslaughter the maximum punishment was life imprisonment and the jury could not have inflicted the penalty of death. Measured by the penalties provided, voluntary manslaughter, with the added criminal record penalties, is still a degree of homicide.

We think he was entitled to the instruction on the lesser degree, as vouchsafed him by the Code provision supra. We have consistently applied the lesser degree instruction. Biggs v. Com., 164 Ky. 223, 175 S. W. 379, Ann. Cas. 1916A, 1096; Hatfield v. Com., 230 Ky. 630, 20 S. W. (2d) 461; Hayes v. Com., 210 Ky. 449, 276 S. W. 160; Lester v. Com., 252 Ky. 358, 67 S. W. (2d) 486; Breeden v. Com., 151 Ky. 217, 151 S. W. 407.

In the Hayes and Breeden Cases, supra, we held that where the facts justify the giving of the instruction under Sec. 239 of the Criminal Code of Practice, the giving of the reasonable doubt of guilt instruction (Criminal Code of Practice, Sec. 238) will not cure the error.

Judgment reversed.

The whole court sitting.